IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KRYSTI SOVA,

               Plaintiff,

vs.

NEBRASKA DEPARTMENT OF
CORRECTIONAL SERVICES,

               Defendant.

4:23-CV-3121

MEMORANDUM AND ORDER

This is an employment discrimination case. The plaintiff, Krysti Sova, alleges her former employer, the defendant, the Nebraska Department of Correctional Services, discriminated against her because she was pregnant, and later retaliated against her for reporting discrimination. She brings this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The defendant has moved for summary judgment on all of her claims. Filing 64. The motion will be denied.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are functions for the trier of fact, not those of a judge on a motion for summary judgment. *See id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the trier of fact could conceivably find for the nonmovant. *See Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

The defendant did not file a reply brief, nor did it respond to the plaintiff's statement of additional undisputed material facts (filing 74 at 12). Those facts are deemed admitted for the purpose of the present motion. *See* NECivR 56.1(b)(3).

## II. BACKGROUND

*Correctional Center Employee Evaluations and Discipline*

The defendant's employees are subject to annual performance reviews, which are used to determine raises and promotions. Filing 74 at 20. Employees are graded in various "competencies" on a scale of one to five, "1" meaning "does not meet" expectations, "5" meaning "greatly exceeds" expectations. *See* filing

66-5 at 3. Employees are also given an overall score between one and five. Employees with an overall evaluation score under "3" are placed on a performance improvement plan ("PIP"). Filing 74 at 3.

Evaluation scores may be influenced by previous corrective actions for performance issues, records of which are saved in the employee's supervisory file. *See* filing 76-1 at 2, 4; filing 66-1 at 28. Corrective actions are issued using a "progressive discipline system" set forth in the employee labor union contract, which consists of three forms: verbal counseling or verbal coaching, a corrective counseling log ("CCL"), and a statement of charges ("SOC"). *See* filing 76-1 at 1.

In verbal counseling, an employee's supervisor identifies an employee's deficient performance and explains the expectations to the employee. Filing 74 at 4. A CCL is a more formal written log that documents a conversation between an employee and supervisor regarding deficient performance. Filing 74 at 4; *e.g.,* filing 66-6. And an SOC is a formal list of violations that triggers an informal hearing in front of the prison warden. Filing 66-1 at 17; *e.g.,* filing 66-13. At an SOC hearing, the warden "can do anything," such as reduce the charge to a CCL, issue a letter of warning, dismiss the charges, demote the employee, or issue up to six months' disciplinary probation. Filing 74 at 5.

At any step of the progressive system, or even without corresponding discipline, a supervisor can issue a PIP. Filing 66-1 at 20-21. When a PIP is in place, supervisors meet with the employee "to touch base to see that the appropriate improvements are being made." Filing 66-1 at 23. And an employee's disciplinary history—including any CCL or SOC—is considered when an employee applies to a different position, or if she applies to be rehired

3

by the correctional center. *See* filing 66-17; filing 76-1 at 2.[1]

An employee's post may be administratively reassigned "as needed." Filing 66-1 at 78. Generally, reassignment is not one of the types of discipline that follows an SOC, but the warden testified that she reassigns employees "due to performance issues or discipline." Filing 66-1 at 78-79. "Performance issues" are not necessarily tied to discipline or a formal sanction. Filing 66-1 at 79.

### *Plaintiff's Employment*

In 2014, the plaintiff[2] was hired as a corporal at the Nebraska Correctional Center in York, Nebraska. As relevant to this lawsuit, in 2019, she was assigned to work in the "Intake and Property" area of the correctional center. Filing 74 at 12. This was a specialized, permanent, non-rotating position, with favorable hours and job duties. *See* filing 74 at 16. Through 2018, the plaintiff received positive performance reviews. Her supervisors at the relevant time were Captain Jericho Johnson and Major Michael Crosby. Johnson was the plaintiff's immediate supervisor.

The plaintiff told Crosby she was pregnant in May 2019. Shortly after, she went on a planned vacation, and when she returned in June, Crosby and Johnson had "discovered" eleven issues for which the plaintiff needed a PIP. Filing 74 at 12. The eleven issues included clocking in early or late; using "unnecessary overtime;" "inability to maintain appropriate and professional

---

[1] The CCL form states that it "will not become a part of the personnel file," but other evidence refutes that. *See, e.g.,* filing 66-17 (CCL is scoring criteria on job application); filing 66-1 at 28 (a supervisory file includes "every coaching log, a copy of every [CCL]").

[2] The plaintiff's full name is "Krysten Braun Sova," *see* filing 76-1 at 1, and the evidentiary materials uniformly refer to her as "Krysten Braun," *e.g.,* filing 66-5.

relationships" with supervisors, co-workers, and inmates; poor time management; unprofessional communication through e-mail; irresponsible use of leave time; "unable to properly open property;" "unable to ship UPS packages;" "incapable of the up-keep and filing of inmate records in property;" and cleanliness and organizational issues. Filing 76-1 at 59.

The plaintiff's performance review for 2018, completed just a few months earlier in March 2019, did not mention any of these issues. *Compare* filing 76-1 at 59, *with* filing 76-1 at 21-36. Some of the issues in the PIP were contradictory to statements in the plaintiff's performance review—Johnson noted that the plaintiff "adhere[s] to [her] work schedule and use[s] [her] leave responsibly," filing 76-1 at 26, and Crosby noted he "received no complaints regarding [her] professionalism," filing 76-1 at 27. The plaintiff successfully completed the PIP in September, and no discipline or other corrective action directly resulted. *See* filing 76-1 at 3. The record of the PIP, however, remained in the plaintiff's supervisory file. *See* filing 74 at 17.

In July 2019, the plaintiff shared her password to the defendant's secure computer system with a coworker. Filing 74 at 5. She was issued an SOC. Following a hearing with the warden on July 17, the plaintiff was given three months' probation; the coworker with whom she shared her password was given a letter of warning. Filing 66-1 at 73. The warden testified that the difference in punishment was based on either employee's culpability—the plaintiff was more senior, and should have gone to her supervisor for help, while the other employee "was just a case worker just trying to help." Filing 66-1 at 73. The plaintiff filed a grievance with her union about the punishment she received, but the disposition of that grievance is not in the record before the Court. *See* filing 76-1 at 3. A record of the SOC and resulting probation were kept in the plaintiff's supervisory file. *See* filing 76-1 at 4.

The plaintiff also filed, in July, a formal, internal complaint against Crosby and Johnson, alleging that she was being harassed because she was pregnant. Filing 76-1 at 4. According to the plaintiff, complaints of discrimination are supposed to trigger an automatic investigation, but the plaintiff's complaint was filed as an "internal complaint," not discrimination. *See* filing 74 at 13. Because she believed the defendant inadequately processed her complaint and continued to discriminate against her, she filed her first claim with the Nebraska Equal Opportunity Commission (NEOC) in August 2019. Filing 74 at 13.

The plaintiff was issued a CCL in early October after failing to complete fingerprint cards for new inmates. Filing 74 at 13. That CCL was ultimately dismissed and removed from her file because it was issued for the "wrong reason." *See* filing 66-1 at 65; filing 74 at 14. In late November, the plaintiff was issued another CCL because she did not have her driver's license. Filing 74 at 15. She alleges, and the defendant does not dispute, that it was her first time making that mistake. Under her union contract, she should not have been subject to a CCL for that error. Filing 74 at 15. A record of that CCL was kept in the plaintiff's supervisory file.

*Investigation and Reassignment*

In early December 2019, prison officials learned that glass jars had gone missing from the Intake and Property area where the plaintiff worked. The defendant received reports that they were being sold among the inmate population. Filing 74 at 8; filing 76-1 at 194. An investigator interviewed the plaintiff about the incident on December 13.

Because of the ongoing investigation, the plaintiff was administratively, temporarily reassigned to a rotating position and had to report each day to know in which area she would be assigned work. *See* filing 66-10 at 1. The

6

plaintiff was temporarily reassigned to the yard, despite being thirty-seven weeks pregnant. Filing 74 at 15. She requested an accommodation to be assigned to the Records Department; that request was denied, though the plaintiff alleges the defendant had previously allowed this accommodation for pregnant employees. Filing 76-1 at 7.

The plaintiff went on maternity leave on December 26, expecting to return on May 8, 2020. Filing 74 at 16. The glass jar investigation concluded in January 2020. According to the investigator's report, the plaintiff allowed an unqualified and unauthorized inmate to work in the Intake and Property area. Filing 76-1 at 195. The plaintiff avers that she was following the protocol in place at the time of the incident. Filing 76-1 at 8. The investigator recommended the plaintiff be issued an SOC, and that the defendant revise the protocol for the Intake and Property area. Filing 76-1 at 8; filing 76-1 at 198.

In February 2020, while she was on maternity leave, the plaintiff's reassignment became permanent—she was removed from the Intake and Property position because, according to the defendant, of "performance issues that jeopardize the safety and security of the facility." Filing 66-10 at 2. The plaintiff was reassigned to a temporary "unit relief" position, with instructions to apply for an open permanent position. *See* filing 66-10 at 2. The plaintiff returned from leave in late February "to fight for her old position back." Filing 74 at 16. The "unit relief" position was not specialized and had less favorable hours and days off—Tuesdays and Wednesdays rather than Saturdays and Sundays. Filing 76-1 at 12. To cover her new shift and accommodate her children's schedules, she had to use 86.28 hours of paid leave and 112 hours of unpaid leave. Filing 76-1 at 12.

The plaintiff filed another grievance and another complaint with the

NEOC on February 25, 2020. Filing 76-1 at 10. The grievance was denied because the reassignment was "justified as an investigatory suspension," even though the investigation had concluded. Filing 76-1 at 11.

On March 23, 2020, the plaintiff was issued an SOC involving the glass jar incident. She filed a grievance challenging the discipline. Ultimately, because of her union's advocacy, the SOC was "dropped because of erroneous information concerning the dates" of the alleged conduct. Filing 74 at 8. The plaintiff then asked to return to her Intake and Property assignment, but the warden denied her request. While the initial justification for the plaintiff's reassignment was the investigation into the missing glass jars, the warden told the plaintiff in late May 2020 that she would not get her position back due to unspecified performance issues. *See* filing 77-1 at 107. When the plaintiff's union attorney asked which performance issues justified the reassignment in June 2020, the defendant's attorney referred to the 2019 PIP that the plaintiff completed in September 2019. *See* filing 77-1 at 109; filing 76-1 at 11.

The plaintiff reapplied for the Intake and Property position in late March 2020. Filing 74 at 10. Her application was scored 17.8 out of 23 possible points; the top applicant had a score of 22 out of 23 points. Filing 66-17. Application scores are calculated based on interviews, performance evaluations, a "Likert scale average,"[3] and disciplinary records—specifically, records of CCLs and

---

[3] The "Likert scale" appears to be a survey about the job applicant's daily performance, completed by an employee's direct and indirect supervisors. *See* filing 66-4 at 93; filing 66-3 at 73. Those survey numbers are averaged to add to an applicant's overall score. *See* filing 66-3 at 73.

SOCs.[4] Filing 66-17 at 2; filing 66-1 at 108. The plaintiff also applied for a "Travel Order Corporal" position, and the position went to someone with lower interview and Likert scale scores. Filing 76-1 at 14.

Later in 2020, the plaintiff applied for a different permanent nonrotating corporal position. She again scored 17.8 out of 23 points; the top applicant scored 19.3. Filing 66-18 at 3. The plaintiff had higher interview and evaluation scores, but her total score was lower than the top applicant's because the plaintiff's file contained a CCL for forgetting her driver's license and the SOC for sharing her password. *See* filing 66-18 at 3. Had the plaintiff scored full points on the discipline factors, her score would have been higher than the top applicant's. *See* filing 66-18 at 3. The plaintiff applied for several other positions throughout 2020, but her scores were never high enough to be promoted. Filing 76-1 at 14.

In November 2020, the plaintiff applied, and was selected, for a "Unit Case Manager" position. Filing 74 at 20. As a case manager, the plaintiff was no longer in the corrections officer chain of command and was subject to different supervisors. *See* filing 74 at 11. However, she asserts, and the defendant does not dispute, that she "was denied support with her caseload and continued to receive corrective action that was not given to fellow similarly situated employees." Filing 74 at 20.[5]

---

[4] Sick leave balances are also included on the score sheets, but, based on the present record, those balances are not factored into an employee's overall score. *See* filing 66-4 at 98.

[5] Both parties assert facts about events that occurred after the plaintiff filed her complaint. *See* filing 74 at 11, 20. But neither party explains how those events are relevant to the pled causes of action. To the extent the plaintiff seeks to assert the defendant constructively discharged her, *see* filing 73 at 27, the Federal Rules of Civil Procedure do not "afford a plaintiff with an opportunity to raise new claims at the summary judgment stage." *WireCo*

## III. DISCUSSION

The plaintiff's complaint alleges that the defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Specifically, she alleges:

- The defendant "discriminated against [her] by disciplining her on the basis of her pregnancy," filing 1 at 7;

- The defendant "discriminated against [her] by harassing her and changing her assignment on the basis of her pregnancy and in retaliation for [her] complaint," filing 1 at 8; and

- The defendant "discriminated against [her] by subjecting [her] to different employment terms, forcing her to use paid and unpaid leave to cover her new shift, based on a statement of charges against her that was determined to be invalid and, in reality, based on her pregnancy," filing 1 at 9.

Title VII bars employers from discriminating against employees by treating them differently on the basis of pregnancy or childbirth. *See* §§ 2000e-2(a)(i), 2000e(k). It also prohibits discriminating against employees who oppose "any practice made unlawful" by the statute. § 2000e-3(a). On summary judgment, for both claims, generally courts employ the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *E.g., Martinez-Medina v. Rollins*, 144 F.4th 1091, 1096 (8th Cir. 2025). *But see Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 322-23 (2026) (Thomas, J.,

---

*WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 231 F. Supp. 3d 313, 318 (W.D. Mo. 2017), *aff'd*, 897 F.3d 987 (8th Cir. 2018).

10

concurring) (doubting whether the *McDonnell Douglas* framework "is a suitable tool for evaluating Title VII claims at summary judgment[,]" as it "requires a plaintiff to prove too much").

Under that framework, first, an employee must establish a *prima facie* case of discrimination by setting forth evidence that would prove: (1) she is a member of a protected class, (2) she was qualified for her position and performed her duties adequately, and (3) she suffered an adverse employment actions, and the circumstances permit an inference that unlawful discrimination was involved. *See Martinez-Medina,* 144 F.4th at 1096. For retaliation, an employee must show: (1) she engaged in protected conduct, (2) a reasonable employee would have found the retaliatory action materially adverse, and (3) the adverse action was causally linked to the protected conduct. *Id.* at 1098. This first step is "not onerous." *See Ames,* 605 U.S. at 309.

Once the employee has made a *prima facie* showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Martinez-Medina,* 144 F.4th at 1096. The burden then shifts back to the employee to show that the proffered reason was pretext for discrimination or retaliation. *See id.* She may do so by persuading the Court that a discriminatory reason "more likely" motivated the employer, or by showing the proffered explanation is "unworthy of credence." *Id.*

The parties do not dispute that the plaintiff was a member of a protected class and that she engaged in protected conduct, nor that the plaintiff was qualified for her job. The defendant argues that the plaintiff failed to prove an adverse employment action, and that the plaintiff cannot show the proffered nondiscriminatory reasons for the discipline were pretextual. *See generally* filing 68. Neither party distinguishes which alleged adverse employment actions correspond to which theory of the plaintiff's case; the Court is satisfied

11

that the plaintiff can meet her burden to survive summary judgment on all three theories.

### 1. ADVERSE EMPLOYMENT ACTION

To begin, neither party seems aware of the recent Supreme Court decision abrogating the Eighth Circuit requirement that an employee must show a "materially significant disadvantage" to state a claim of discrimination under Title VII. *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 353 (2024). Rather, an adverse employment action is simply one that causes "some harm" respecting an identifiable term or condition of employment. *See id.* at 355. An employee need not show that the harm incurred was "'significant' . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* Claims of retaliation, on the other hand, do require this heightened showing. *See id.* at 357.

Pre-*Muldrow*, the Eighth Circuit held that "'papering' an employee's file with negative reports or reprimands," where those reports detrimentally alter the terms or conditions of employment, is sufficiently adverse to meet the Title VII "heightened" showing. *Tademe v. St. Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003); *Henthorn v. Capital Comms., Inc.*, 359 F.3d 1021, 1029 (8th Cir. 2004); *see also Pujji v. Buttigieg*, No. 4:21-CV-445, 2025 WL 328094, at *11 (E.D. Mo. Jan. 29, 2025); *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 927 (8th Cir. 2007), *abrogated on other grounds by Torgerson*, 643 F.3d 1031; *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879-80 (8th Cir. 2005).

The defendant argues that the discipline imposed, including the 2019 PIP, "being blamed" for the missing glass jars, coaching logs in September and October of 2019, and the CCL about fingerprints "are categorically not adverse

employment actions." Filing 68 at 7. The CCL about fingerprints was removed, and the plaintiff does not appear to argue the coaching logs impacted her employment, *see generally* filing 76-1, so those actions do not qualify as adverse. However, the Court is satisfied that the 2019 PIP, later used to justify the plaintiff's reassignment, was an adverse action, as it caused the plaintiff "some harm" in the terms and conditions of her employment. *See Muldrow*, 601 U.S. at 357; *Pujji*, 2025 WL 328094, at \*11. The missing glass jars incident is discussed more below.

## 2. PRETEXT

The defendant argues that its employment decisions to suspend the plaintiff for three months in July 2019, and to reassign her from Intake and Property in February 2020, are supported by legitimate, nondiscriminatory reasons. The plaintiff asserts the proffered reasons are pretextual, and the true motivation was to discriminate against her because she was pregnant, or to retaliate against her because she reported discrimination.

Pretext can be established a number of ways—for example, through evidence that an employer "shifted its explanation of the employment decision;" that similarly-situated employees were treated better; that the employer contravened its own policies; or that the proffered reason is false. *E.g., Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1135 (8th Cir. 2020); *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (citing *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994)). However, federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994) (internal quotations omitted). The Court does not get to decide whether the proffered reason for the discipline "was wise, fair, or even correct." *See*

13

*Canning v. Creighton Univ.*, 995 F.3d 603, 611 (8th Cir. 2021). Rather, a plaintiff must present some evidence that, if proven, would show the defendant is being dishonest in its proffered explanations. *See id.* at 612.

### (a) 2019 PIP

As explained above, putting the plaintiff on a PIP in 2019 was an adverse employment action. The defendant makes no effort to proffer a nondiscriminatory reason for the PIP; it simply asserts that issuing a PIP cannot satisfy a Title VII claim, relying on abrogated Eighth Circuit law. *See* filing 68 at 7. Some of the performance issues listed in that PIP were directly contrary to her annual review completed just a few months earlier, and it's unclear when or how the plaintiff's performance deteriorated, considering she was on vacation for much of the time in between the PIP and her annual review. Based on the above, and the *very close* timing between the plaintiff disclosing her pregnancy and the defendant issuing a PIP, the record supports an inference that the PIP was issued to discriminate against the plaintiff because she was pregnant. The plaintiff's Title VII discrimination claim will therefore survive summary judgment.

### (b) July 2019 Probation

The plaintiff was put on three months' probation in July 2019, very shortly after the PIP issued, and very shortly after she reported that Crosby and Johnson discriminated against her. The defendant's nondiscriminatory reason for the probation is because the plaintiff shared a secure password with another employee. Filing 68 at 8. The plaintiff claims this reason is pretextual because other employees were not punished as severely for similar conduct. *See* filing 66-8 at 3.

14

"Others-were-treated-better" evidence requires a showing that other employees were "similarly situated in all relevant respects," including showing violations of comparable seriousness and that the comparators "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Canning*, 995 F.3d at 613-14.

The evidence in this case shows that other employees were disciplined after using state computers for personal use, streaming music, or showing mugshots to inmates. Filing 66-8 at 3-4. None of that conduct is comparable to the plaintiff's allegation of sharing a password. There is no evidence from which the Court, nor a reasonable juror, could determine that the defendant is being dishonest about how seriously it takes security issues such as sharing passwords, such that the motivation for the plaintiff's probation was because of her pregnancy or because she reported discrimination.

The plaintiff also argues that the employee with whom she shared her password was punished less harshly. But the defendant's proffered explanation—that the other employee was junior to the plaintiff and was less culpable—does not raise any inference of discrimination, and the plaintiff has not provided any other argument for why the defendant's explanation is unworthy of credence. *See Bharadwaj*, 954 F.3d at 1135 (employer has "the right to discipline [an employee] regardless of who was at fault in each incident"). There is, therefore, nothing in the record supporting an inference that the defendant disciplined the plaintiff in this instance for unlawful discriminatory or retaliatory reasons.

15

### (c) CCL for Driver's License

The plaintiff's job application scores were negatively impacted by the CCL issued for forgetting her driver's license. The defendant did not brief a nondiscriminatory reason for the CCL, and the plaintiff's undisputed evidence indicates that the CCL was issued contrary to both her union contract and the defendant's normal procedures. An inference of pretext is permitted where an employer fails to follow its own rules. *See Bharadwaj*, 954 F.3d at 1135.

### (d) Reassignment

The final, and most impactful, adverse employment action alleged is that the defendant reassigned the plaintiff from a specialty, permanent, nonrotating position to a non-specialty, temporary, rotating position with less favorable hours. The defendant argues that the plaintiff's reassignment was "because she committed a major safety violation and failed to disclose it to security personnel." Filing 68 at 9. That is a nondiscriminatory reason for the discipline imposed. The plaintiff, however, has sufficient evidence of pretext.

It's true that the plaintiff was initially reassigned from her position because of an investigation into an alleged safety violation. She was reassigned "temporarily," pending that investigation, most of which occurred while she was on maternity leave. But ultimately, the defendant "dropped" the formal SOC issued against the plaintiff for that alleged misconduct. When the plaintiff asked for her position back, she was told that unspecified "performance issues" justified the reassignment. But then, the defendant changed course, and listed issues from the 2019 PIP. Now, the defendant again asserts, in litigation, that the glass jar incident is the reason for her removal. These shifting explanations support an inference of pretext. *See Kobrin*, 34 F.3d at 703.

The time between the plaintiff's pregnancy and the SOC—nine months—

cuts against an inference in the plaintiff's favor. And the defendant argues, even though the SOC was dropped because of a "clerical technicality," the conduct involved supports the warden's decision to reassign the plaintiff's position. Filing 68 at 10. However, viewing the record as a whole, the evidence supports an inference that the defendant's explanations for reassigning the plaintiff are not worthy of credence.

However, the plaintiff's reports of discrimination to the NEOC, in August 2019 and February 2020, are closer in time to the purported adverse action. The second report, in February, was after the temporary reassignment, but the reassignment became permanent shortly after, permitting an inference that her permanent reassignment was because of her second NEOC report. Based on the forgoing, the evidence supports an inference that the reassignment was motivated by the plaintiff's charge of discrimination.

The defendant has not put forth any other reason for the reassignment. It only argues that the glass jars incident, and the 2019 PIP, justified the change in the plaintiff's position. And, as discussed above, the evidence supports an inference that 2019 PIP carries with it discriminatory animus; to use that PIP to justify the reassignment calls into question the defendant's purportedly nondiscriminatory explanation and suggests the given reason was pretextual. A reasonable juror could conclude the plaintiff's reassignment was motivated either by her pregnancy, or because she reported retaliation.

The plaintiff appears to raise claims for failure-to-hire or failure-to-promote, based on her lower application scores caused by the SOC and CCL in her record. However, those claims are not viable (nor were they clearly pled). For the reasons explained above, there is no evidence the SOC that reduced her score was issued for discriminatory or retaliatory reasons. While the evidence might support an inference that the CCL for forgetting her driver's

17

license was discriminatory or retaliatory, even if the CCL was not included on her application, the plaintiff's score would still be lower than the top-scoring applicant. That said, the plaintiff would not have needed to apply for other positions had she not been reassigned from her preferred station, so she does not need to prove the defendant failed to hire or promote her to recover corresponding damages.

## IV. CONCLUSION

Each of the plaintiff's theories of discrimination and retaliation will proceed to trial. In particular, whether the defendant issued a PIP in 2019 for discriminatory reasons, or whether the plaintiff was reassigned from the Intake and Property area for discriminatory or retaliatory reasons, are questions of fact that cannot be decided on summary judgment. For these reasons,

IT IS ORDERED that the defendant's motion for summary judgment (filing 64) is denied.

Dated this 3rd day of June, 2026.

BY THE COURT:

John M. Gerrard
Senior United States District Judge

18